UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT J. BARNHART,

        Plaintiff,

-vs-

DAIMLERCHRYSLER CORP.,
A Delaware Corporation,

        Defendant.
_____/

CASE NO. 06-CV-13305

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

**OPINION AND ORDER GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Court is Defendant DaimlerChrysler Corporation's (now "Chrysler LLC") ("Defendant") October 30, 2007 Motion for Summary Judgment. (Doc. No. 20). Plaintiff Robert J. Barnhart ("Plaintiff") filed a Response on December 9, 2007. The Court held a motion hearing on January 23, 2008. Having considered the entire record, and for the reasons that follow, the Court GRANTS Defendant's motion.

**I.    BACKGROUND**

This case arises from Plaintiff's allegations that Defendant failed to accommodate his disability in violation of the Americans with Disabilities Act ("ADA").

Plaintiff is a resident of Oakland, Michigan. (Compl. ¶ 4). Plaintiff was hired in November 1984, and worked for Defendant until taking medical leave on January 21, 2004. (Compl. ¶ 9). From approximately the year 2000 until taking his medical leave, Plaintiff worked for Defendant as a process engineer / tooling specialist for the Advanced Manufacturing

1

Engineering ("AME") and in Trim, Chassis and Final ("TCF") areas, based in Auburn Hills, Michigan. (*Id.*; Def. Br. 2).

According to Defendant's job description, a process engineer is responsible for the following tasks:

(1) Use product information to determine the tooling and process requirements for the assembly of the vehicle;
(2) Meet with product engineering teams and operation managers to create PFMEAs;
(3) Document final tooling and process specifications using AMPS and MEDDS;
(4) Work in conjunction with the purchasing and the finance organizations to place jobs with the suppliers that will actually build the tool;
(5) Oversee the various aspects of the actual tool build at the supplier's place of business, retaining ultimate responsibility for C.D.S. Quality Gate achievement and build timing;
(6) After the tool is built, oversee the installation and pre-production operation of the tool at the Pilot Validation Test Center. This includes the creation of S0 Release AMPS sheets and the responsibility to identify, analyze, and resolve process and tool related build issues; and
(7) Finally, oversee the installation and "productionizing" of the tool at the final product build location. During this stage, the engineer is assigned to work at the site until production volume launch of the vehicle is achieved and the final too buyoff occurs.

(Def. Br. Ex. A, Process Engineer Job Description).

Defendant submits an affidavit from David J. Partlow, an AME Chassis Supervisor, to explain the job responsibilities of a process engineer in Plaintiff's group: (1) meeting with product engineering teams to create the process specifications, which are then documented in a computer; (2) meeting with suppliers throughout the build process, often at the supplier's place of business; (3) overseeing the installation and pre-production of the tool at Defendant's Pilot Validation Test Center to ensure that it operates effectively, and to analyze and resolve all tool-related build issues for the suppliers; (4) overseeing the installation of the tooling / equipment at

2

the facility where it will be used and to remain on-site until production volume launch of the vehicle; (5) managing the initial monetary investment as well as all of the changes for the tooling/equipment for which the process engineer is responsible; and (6) travel to the plants to provide in-plant project management support and to support the manufacturing process. (Def. Br. Ex. B, Partlow Aff. ¶¶ 6-14).

On August 26, 2004, Plaintiff completed Defendant's ADA Accommodation Form. (Def. Br. Ex. F, ADA Form).[1] Plaintiff identified his impairments as "pulmonary fibrosis, leukemia, and diabetes." (*Id.*). He "require[d oxygen], and dust/fume free environment [and had] a random sleep pattern." (*Id.*). His accommodation request stated: "work at home over internet. My last assignment was 100% computer work." (*Id.*).[2]

---

[1] Plaintiff also applied for, and was granted, total disability status by the Social Security Administration. (Def. Br. Barnhart Dep. 71).

[2] Defendant points out that Plaintiff could not identify the details or time frame of his last assignment that involved "100% computer work." (Def. Br. 4 n. 4). Plaintiff had also taken a number of extended medical leaves beginning in the year 2000. (Def. Br. Ex. H, Standard Employee Change Notice).

On September 29, 2004, Doctor William S. Gonte performed an examination of Plaintiff. (Pl. Br. Wicker Dep. Ex. 3, Gonte Letter). Gonte's clinical impressions included: (1) pulmonary fibrosis; (2) history of Hodgkin's lymphoma; (3) history of leukemia; and (4) diabetes. (*Id.*). Gonte further opined:

> The patient has progressive pulmonary dysfunction due to pulmonary fibrosis secondary to his chemotherapy treatment. His prognosis is poor.
>
> At this point, he is unable to return to his usual job activities. He would be able to work out of his house and fulfill his duties required of him from his house. At this point, it appears that he is unable to return back to his work outside of the house on a regular basis. This appears to be a permanent restriction.

(*Id.*).

Plaintiff's request to work at home was referred to David Darling, the human resources representative responsible for Plaintiff's group. Darling contacted Plaintiff's senior manager Karen M. Strausbaugh for input on the current location demands for process engineers. In an email dated October 27, 2004, she indicated that since August 2004, the process engineers were spending 30% of their time at the suppliers, 50% in pilot plants, and 20% working at their desks on AMPS or MEDDS. (Def. Br. Ex. C, 10/27/04 Strausbaugh Email). The email further indicated that as of March 2005, the process engineers would be assigned to the Belvedere facility for a year and a half, coming home for some weekends, but spending 90% of the time at the plant. (*Id*.). Partlow confirms that for the period 2004-06, Plaintiff would have been required to: (1) visit the plants to provide in-project management support; (2) visit supplier locations to check on build status of tooling/equipment, chair kick-off meetings, attend status meetings, among others; (3) from 2004 to June 2005, spend 10% to 15% of time at Belvedere Plant; (4) from July 2005 to June 2006, spend 80% to 90% of the time at Belvedere; and (6) from June 2006 to December 2006, 15% to 20% of the time at Belvedere. (Partlow Aff. ¶¶ 13-16).

Darling reported the results of his investigation to his supervisor Lisa Wicker. (Darling Dep. 32, 44). His recommendation addressed Plaintiff's accommodation request under the ADA. (*Id*. at 39-40).

Plaintiff's union filed a grievance on his behalf pursuant to its collective bargaining agreement.[3] While the grievance was pending, Didier Papin, a platform executive, asked Michael

---

[3] Plaintiff's grievance was dismissed at the second step, since it was determined that there was no contractual violation. (Gamble Dep. 35).

Gamble, Plaintiff's union steward, to generate a list of tasks that Plaintiff could perform. (Def. Br. Papin Dep. 10-11).

Gamble testified that around March 9, 2005, Darling indicated to him that "it looked like" Defendant could accommodate Plaintiff's disability. (Def. Br. Gamble Dep. 24).

On April 14, 2005, Gamble wrote an e-mail to Didier Papin concerning Plaintiff's ability to perform his former job functions:

> The aspect of tool process that [Plaintiff] would not be able to perform would be plant visits and plant launch support. I believe that he would be able to visit supplier locations and check build status of tooling, provided that the visit was not for an extended period of time (dust in the air affects him very much). He would not be able to visit the assembly plant and provide day to day support (due to air quality and necessity to recharge his O2 supply). I feel that there are many ways which his services can be of use to the AME organization, not only TCF but also Core Manufacturing and Technologies, as we have discussed.

(Def. Br. Ex. I, 4/14/05 Gamble Email).

On April 15, 2005, Papin wrote an email to Darling, on the subject of Plaintiff's ability to complete his job tasks:

> What I would like to add to the picture is that [Plaintiff's] ability to perform these task would be even more limited. He cannot realistically be expected to interface sufficiently with other functional groups to perform these tasks on a new program where communication is intense. Nor should he be expected to follow tools at suppliers (or very limited case). I am concerned that his condition could be worsened by such actions.
>
> There could definitely be some opportunities for AMPS maintenance, documentation tracking and reporting that he could perform remotely by having access to a computer (which we would have to set up at his home with IT).
>
> I also asked Dale Daugherty (Manager for torque programs) to prepare a list of activities [Plaintiff] could perform for him:
>
> List of potential work items for [Plaintiff]

- Torque miss-match / PM/MK – requires AMPS & network (reports preparation for weekly updates). Other programs as well.
- Engineering Notes ? (reports preparation for weekly updates)
- Instantiations – requires TDAS, AMPS, EBOM – data entry for torque programs at S0
- Capability Reports – requires TDAS & PDB database –
- Update AMP Sheets with torque & tool information
- Ergonomic Evaluations for AMPS

Bottom line is that [Plaintiff] could perform these tasks (data maintenance tasks or report preparation), but this is not a conventional workload for a process engineer; and while possibly a good use of [Plaintiff's] talent, we could not duplicate this to other engineers who would claim working from home.

Please let me know as soon as you can the result of your recommendation.

(Def. Br. Ex. J, 4/15/05 Papin Email).

On April 25, 2005, Wicker wrote an email to Papin concerning Plaintiff:

Dave [Darling] spoke to me about this issue some time ago. I asked him to check with legal and union relations to determine the likelihood of agreeing to the terms of the request and to determine where we have provided this option before. Preliminarily, I would say that we do not support this type of arrangement for a number of reasons[.] One, it may set the stage for pattern negotiations relative to flexible work arrangements within the union. Two, how long will this arrangement lasts [sic] and will we be allowed to discontinue as required? How do we accurately measure performance? These are not reasons that you should provide to the union. I would suggest that you allow Dave to respond to the reps. In the meantime, please let them know that the matter is still being reviewed.

I don't recall the full story as [to] what the disability is, but I am copying Dave on this email so that he can follow-up with you upon his return. I too believe this should be closed sooner rather than later.

(Pl. Br. Ex. 2, Wicker Dep. Ex. 4).

Wicker testified that: (1) she was unaware of Plaintiff's independent medical examination by Defendant's physician; (2) the list of functions, compiled by Papin and Gamble, that Plaintiff could perform at home. (*Id.* at 42-48). Wicker explained that the reasons provided in the April

25, 2005 email to Papin were not based on Defendant's assessment of ADA requirements, but rather directed at union contract issues. (*Id*. at 55; Def. Reply Ex. T, Wicker Aff. ¶ 13).

Around May 3, 2005, Darling told Gamble that human resources would be drafting an agreement between Plaintiff and Defendant. (Gamble Dep. 25). However, on May 9, 2005, Darling indicated to Gamble that "it did not look good for [Plaintiff's] return." (*Id*.).

On August 16, 2005, Plaintiff completed another ADA Accommodation Form, upon which he indicated "filled out under protect 'redundant' See original ADA request 8/26/04." (Def. Br. Ex. G, 2nd ADA Form).

In his deposition, Plaintiff testified that he was aware of another process engineer, Brian McAuley, who was permitted to work from home:

> Q: And do you know Mr. McAuley personally?
> A: Yes.
> Q: How do you know him?
> A: He's a process engineer, as – like I am.
> Q: Did you ever work with him?
> A: No. And in a – on a project or in the same facility?
> Q: Well, let's start out with on a project.
> A: No.
> Q: In the same facility –
> A: Yes.
> Q: -- you did work with him. Okay. And how do you know that he was working at home?
> A: It was common knowledge.
> Q: Did you ever talk with Mr. McAuley about his arrangement?
> A: No.
> Q: Other than what you heard at work, do you have any knowledge of specifically what he was doing at home?
> A: He had some –
> Q: Well, let me just – my question first is other than what you heard at work, on the floor at work –
> A: Uh-huh.
> Q: -- do you have any specific knowledge of what he was doing at home?
> A: Other than what I've heard on the floor, no.

7

| | |
|---|---|
| Q: | Okay. What did you hear on the floor? |
| A: | That he was – he was – he's in the garage group, and he was doing his job from home, basically. And they set up a CATIA station for him at home, and I believe a computer and a phone and a few other things at a pretty good cost to the company. |
| Q: | And do you know what the – what medical condition Mr. McAuley had? |
| A: | I don't, I'm not a doctor – other than what I've heard, rumor. |
| Q: | Okay. What was the rumor that you heard? |
| A: | It was his back problem. |
| Q: | Okay. And I take it that you never went to Mr. McAuley's home to see what was set up, correct? |
| A: | No, I've never been there. |
| Q: | And you don't have any personal knowledge, as far as what Mr. McAuley was able to do in terms of going to suppliers or going into a plant environment or traveling or anything of that nature, do you? |
| A: | No, no really. |

(Barnhart Dep. 68:15 – 70:1-12).

On the subject of McAuley, Gamble testified that: (1) he did not know what McAuley did from home; (2) he was unaware of whether McAuley was able to visit plants; and (3) McAuley returned to work in Defendant's Tech Center in 2007. (Gamble Dep. 29-30, 41-42).

However, Gamble testified about another employee accommodation involving Kirk Miller, a process engineer that had a back problem that prevented him from long automobile rides or airplane flights. (*Id*. at 39-40). Defendant accommodated Miller in 2006 by assigning him only to in-town assignments. (*Id*. at 40-41).

On October 30, 2007, Defendant moved for summary judgment, contending in essence that Plaintiff is requesting that Defendant create a new position for him that involved solely the computer work component of the process engineer position, and exempting him from supplier visits and plant launches.

## II. ANALYSIS

### A. Summary Judgment Standard

The United States Court of Appeals for the Sixth Circuit has recently summarized the relevant legal standard for a summary judgment motion:

> Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In reviewing a motion for summary judgment, we view the evidence, all facts, and any inferences in the light most favorable to the nonmoving party. "To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact." A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]."

*Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 500-01 (6th Cir. 2007) (internal citations omitted).

### B. ADA Claim

Defendant argues that it is entitled to summary judgment since Plaintiff cannot show that, with or without reasonable accommodation, he can perform the essential functions of his job. Defendant asserts that: (1) Plaintiff's inability to visit plant and supplier sites precludes him from performing essential functions of the process engineer job; and (2) the ADA does not require an employer to create a new position for a disabled employee or to reallocate these essential functions to other employees.

Plaintiff responds that: (1) there is a question of fact whether Plaintiff's health restrictions prevented him from performing the "essential functions" of a process engineer; (2) Defendant's employees indicated that a reasonable accommodation would be possible; and (3) Wicker's rationale for denying a work at home accommodation was motivated by a lack of

9

knowledge on her part as to Plaintiff's condition and union issues, rather than ADA compliance.

The Sixth Circuit has provided the standards for evaluation a plaintiff's claim under the ADA:

> For [an] ADA claim to succeed, [a] plaintiff must prove that (1) he has a disability; (2) that he is "otherwise qualified" for the job; and (3) that defendants either refused to make a reasonable accommodation for his disability or made an adverse employment decision regarding him solely because of his disability. For the purposes of this motion for summary judgment, defendants have stipulated that plaintiff qualifies as an individual with a disability under the ADA. Our inquiry, therefore, is limited to whether plaintiff was "otherwise qualified" for his position, and whether he was denied reasonable accommodations.
>
> The ADA defines the term "qualified individual with a disability" to mean "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." The "disabled individual bears the initial burden of proposing an accommodation and showing that *that* accommodation is objectively reasonable." The employer, however, bears the burden of persuasion on whether a proposed accommodation would impose an undue hardship.

*Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997) (internal citations omitted) (emphasis in original).

In defining "essential function" for the purposes of the ADA, the Code of Federal Regulations provides in relevant part:

(1) The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term "essential functions" does not include the marginal functions of the position.

(2) A job function may be considered essential for any of several reasons, including but not limited to the following:

    (i) The function may be essential because the reason the position exists is to perform that function;

10

- (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

- (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

(3) Evidence of whether a particular function is essential includes, but is not limited to:

- (i) The employer's judgment as to which functions are essential;

- (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

- (iii) The amount of time spent on the job performing the function;

- (iv) The consequences of not requiring the incumbent to perform the function;

- (v) The terms of a collective bargaining agreement;

- (vi) The work experience of past incumbents in the job; and/or

- (vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n). "The inquiry into whether a function is essential is highly fact specific." *Hoskins v. Oakland County Sheriff's Dep't*, 227 F.3d 719, 726 (6th Cir. 2000). "Such a determination should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved." *Hall v. United States Postal Serv.,* 857 F.2d 1073, 1079 (6th Cir. 1988).

To establish the "reasonable accommodation" prong, the ADA requires that a plaintiff "must establish that a 'reasonable' accommodation is possible, and bears a traditional burden of proof that she is qualified for the position with such reasonable accommodation. If the plaintiff

establishes that a reasonable accommodation is possible, the employer bears the burden of proving that such reasonable accommodation would impose an undue hardship." *Monette v. Electronic Data Sys. Corp.,* 90 F.3d 1173, 1186 n. 12 (6th Cir. 1996). However, the ADA does not require an employer to create a new position for the employee, nor is required to shift essential job functions to other employees. *Hoskins*, 227 F.3d at 729.

The parties do not dispute the first prong of the ADA analysis – that Plaintiff has a disability. Rather, Defendant focuses upon the "essential function" and "reasonable accommodation prongs.

Plaintiff contends that: (1) there is a question of fact as to the essential functions of the process engineer position; (2) Defendant had accommodated Miller's restrictions; and (3) there is reason to question Defendant's motives in denying his requested accommodation. None of these arguments warrant a denial of Defendant's motion.

First, Plaintiff relies on Gamble's deposition testimony for the propositions that: (1) Defendant could reallocate the on-site portion of the job to other process engineers; and (2) Defendant had made similar accommodations for other process engineers. The Court finds that this is not an entirely accurate characterization of Gamble's view. Gamble stated that that when process engineers cannot, for reasons such temporary unavailability or to equalize overtime hours among employees, work onsite at a plant or supplier, other available process engineers fill in from time to time. (Gamble Dep. 38-39). Gamble did not opine on whether a process engineer could completely eliminate the onsite portion of the job description. In fact, Gamble testified that physically being at a plant was an important part of the job, especially at the Belvedere plant in 2004 and 2005. (*Id*. at 33-35).

Considering the evidence in the record under § 1630.2(n), the Court finds that: (1) Defendant considers the ability to travel to plants and supplier locations essential to the position; (2) the written job description explicitly requires travel; (3) in 2004 and 2005, a significant amount of the process engineering work occurred offsite; and (4) the consequence of not requiring Plaintiff to travel burdened other employees with that function.

Furthermore, Plaintiff's proffered accommodation impermissibly requires that either Defendant create a new position for him, or that it reallocate essential portions of his job to others. *Hoskins*, 227 F.3d at 729.

Second, Plaintiff contends that Defendant reasonably accommodated Miller in permitting him to have an in-town assignment in 2006. However, Gamble did not suggest that Miller was allowed to work from home via the internet – Miller was simply assigned to plant locations locally to accommodate his back problems. Furthermore, it is not clear that Miller's assignment to work locally in 2006 has any relevance to Plaintiff's job demands in 2004 which required a significant amount of time to be spent at the Belvedere plant.

Finally, Plaintiff argues that Wicker and Darling denied Plaintiff's request for accommodation because of union/contract issues, rather than compliance with the ADA. However, Plaintiff confuses Defendant's determination of whether Plaintiff could perform the essential functions of his job for purposes of the ADA, and Defendant's subsequent inquiry into Plaintiff's union grievance. The record indicates that Plaintiff could not perform an essential function of his job, thus Defendant did not violate the ADA. In response to Plaintiff's union grievance, Defendant next attempted to determine whether Plaintiff could perform certain aspects of his job. The grievance was dismissed at step II, when no violation of the agreement

13

was found. Whether or not Defendant violated its contract obligations to Plaintiff in this case is not at issue.

Therefore, for the foregoing reasons, the Court GRANTS Defendant's motion for summary judgment.

## III. CONCLUSION

The Court hereby **GRANTS** Defendant's Motion for Summary Judgment.

**SO ORDERED.**

                s/Paul D. Borman
                PAUL D. BORMAN
                UNITED STATES DISTRICT JUDGE

Dated: January 31, 2008

### CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on January 31, 2008.

                s/Denise Goodine
                Case Manager